## THE BUENA VENTURA.

### THE MERCEDES.

(District Court, S. D. New York. September 23, 1902.)

1. COLLISION—VESSELS CROSSING—INLAND RULES 19, 21, AND 22.

A collision occurred in New York Bay between the steamship Buena Ventura, coming up the channel from the sea, and a barge on the side of the tug Mercedes, which was on a crossing course, going toward the Brooklyn shore. *Held*, under the evidence, that the tug gave timely and proper signal of her intention to cross under the stern of the steamship, as required by articles 19 and 22 of the inland rules, and followed the same by·reducing speed, and changing her course to starboard for that purpose; that the steamship, after answering the signal, instead of keeping her course and speed, as required by article 21, changed her course, or sheered to port, striking and sinking the barge, and that she was solely in fault for the collision.

2. SAME—INJURY OF SEAMAN—CONTRIBUTORY NEGLIGENCE.

A seaman injured in a collision was not chargeable with contributory negligence because he went below for his coat after the danger of collision became imminent.

In Admiralty. Suits for collision.
See 108 Fed. 588.

Wheeler & Cortis, for libelant Derby.
James J. Macklin, for libelants Osborn & McCreery.
Peter S Carter, for the Buena Ventura.
Black & Kneeland, for Sea Ins. Co.

ADAMS, District Judge. These actions arose out of a collision which occurred about 8 o'clock in the morning of the 6th day of April, 1901, between the steamship Buena Ventura and the barge Sampson, which was in tow of the tug Mercedes. The latter with her barge on her starboard side, was proceeding from the landing known as pier 4, Black Tom, on the New Jersey side of the harbor of New York to 41st Street, South Brooklyn. The steamship was bound in from sea, with a cargo of coal. The collision occurred in the vicinity of the Statue of Liberty, near the eastern line of the anchorage ground. The steamship struck the barge on her port bow with her stem, inflicting a wound which caused the barge to sink. Nearly all of her cargo of flour was lost or greatly damaged. The libellant Osborn, who was mate on board of the barge, had his leg broken. Derby, the master of the tug, brought the action against the steamship as bailee to recover the damages to the barge and cargo. Osborn filed a libel against the steamship and the tug on his own behalf. McCreery filed a libel against the steamship and the tug to recover his damages as owner of the barge. The Luckenbacks as owners of the steamship filed a petition to bring the tug in to that action. The Sea Insurance Company filed a petition as insurer of the cargo on the barge to intervene for its interest in the action against the steamship and the tug. The libels and petitions

¶ 1. Collision rules, see notes to The Niagara, 28 C. C. A. 232; The Mount Hope, 29 C. C. A. 368.

were duly answered. There is no allegation of fault on the part of the barge and liability for the damages rests between the tug and the steamship.

The tug alleges that when she had nearly reached the line of the anchorage ground, the steamship was seen on her starboard bow about a quarter of a mile away bound up the river on the westward side of the channel and had been before concealed from the tug by vessels lying on the anchorage ground; that immediately upon seeing the steamship the tug slowed, stopped her engines and blew to her a signal of one whistle, which signal was answered promptly by a signal of one whistle from the steamship; that the tug thereupon ported her helm in order to pass astern of the steamship and proceeded on the changed course and would have passed astern of the steamship had not the latter changed her course and sheered in towards the tug, which thereupon stopped and reversed, giving alarm whistles but without being able to avoid the collision. The tug's allegations of fault against the steamship are: (1) That the steamship did not keep to the side of the channel or mid channel which lay on her starboard side, although it was safe and practicable for her to do so but ran over close to the port side of the channel and to the line of the anchorage ground; (2) that she did not keep her course, but changed to the port; (3) that after exchanging the signals mentioned, she did not comply therewith but changed to the port; and (4) that she did not stop and reverse in time to avoid the collision.

The steamship alleges that when she was proceeding on a proper course up the channel, her attention was called to the tug and barge, then heading on a line across the course of the steamship; that the steamship proceeded on her course when suddenly the tug blew a signal of one whistle and afterwards ported her helm; that the steamship answered the signal with a similar one and ported her helm, with the effect of changing her course to the starboard; that without any further notice or warning the tug brought the port bow of the barge in contact with the fluke of an anchor which was hanging over the starboard bow of the steamship close to the stem; that the steamship's engines were reversing full speed at the time of the collision and her headway stopped; that the tug after changing her course to the starboard under her port helm, let go the bow line of the barge which caused the barge to sheer across the bow of the steamship and brought about the collision. The steamship's allegations of fault against the tug are (1) in having the steamship upon her starboard side and not keeping clear; (2) in suddenly attempting to cross the course of the steamship; (3) in not stopping and reversing in time; and (4) in letting go the bow line as otherwise the barge would have gone clear.

The other parties in interest allege practically the same faults against the respective vessels and in addition that neither had a proper lookout and did not blow alarm signals.

The main disputes upon the facts are whether the tug having the steamship on her starboard hand improperly attempted to cross the bow of the steamship, in violation of articles 19 and 22 of the Inland Rules, and whether the steamship kept her course under article 21.

There is the usual conflict of testimony in the case, the crew of each vessel sustaining the respective contentions. Those on the steamship say generally that the tug and tow kept on across the bow of the steamship and having crossed and reached a position where, if their course had been maintained, they would have been on the starboard side of the steamship and out of her way, while those on the tug say generally that the tug having stopped to let the steamship pass across her bow and ported her wheel to pass under the steamship's stern in conformity with the obligation of the rules and the signals, the steamship then instead of keeping on her course up the channel or porting to give the tug more room, changed her course to the port and made it impossible for the tug to avoid her.

Apart from the bearing of such of the witnesses as I heard, there is some testimony in addition to that of those on the tug and some circumstances which determine the controversy with respect to the steamship's change of course against her. One of the circumstances is the place of the collision, which is an important factor in the determination, because it tends to show what was done by the vessels. In this connection, the tug says that she stopped her engines before leaving the anchorage ground in the expectation of the steamship keeping up the channel and did not get much if any beyond the anchorage limit forming the western side of the channel, when the collision happened. The steamship says the tug proceeded across the channel from a position four points on the steamship's port bow and had reached a point to the eastward of mid channel, at least a quarter of a mile from the western side of the channel, where she was in a position to let the steamship pass under her stern, when she turned around to the southward and westward bringing about the collision. Important testimony is produced by the tug from the steamship Mora which was anchored at the time of the collision to the westward of the anchorage line and a little above the Black Tom Channel. The mate of that vessel was on watch and testified that the place of collision was in the immediate vicinity of his vessel and that the Buena Ventura changed her course to the westward prior to the contact. The master of the steamer Navigator, who was in a favorable position in the vicinity to see the collision and what preceded it, was called on behalf of the Buena Ventura. He said that she starboarded her wheel and sheered to the westward to avoid the tug and tow. Another witness called on behalf of the steamship, the master of the steamer Hollenbeck, also in the vicinity, said that at the time the tug blew her signal of one whistle, she was on the southeast side or outer edge of the anchorage ground. Other testimony satisfies me that after the whistle was blown, the tug did not proceed any substantial distance further out but immediately swung around to the southward and westward, as she was able to do without going further to the eastward. It seems to be established that the collision took place in the immediate vicinity of the anchorage ground and that the steamship changed to the westward from her regular course up the channel to reach this place. The master of the steamship said he stopped to permit the tug and tow to cross ahead when she was on his port hand and it is manifest that he

also changed his course to the westward. It was the duty of the steamship to keep her course and speed and the tug was entitled to rely upon her doing so in directing her own navigation.

I regard the fault of the steamship as the proximate cause of the collision. No point is made that the signal of the tug, indicating her intention to pass under the stern of the steamship, was not timely or that the steamship was in any way misled by its absence at an earlier time than it was given, and I do not find fault on the tug's part in any of the particulars alleged.

The libellant Osborn had his left leg broken above the ankle by being jammed in the collision. There does not appear to have been any fault on his part. It is urged for the steamship if he had not gone below to get his coat just before the collision, and with knowledge of the probability of its happening, that he could not have been hurt but such action can scarcely be deemed a contributing fault. Of course, he was bound to avoid the danger, if he could, but he could not be expected to anticipate that if he endeavored to save a necessary garment, it would result in his injury. He was caught in some wreckage and thrown overboard, suffering much pain therefrom, which necessarily continued to some extent, but he seems to have sustained no permanent injury. He had been earning about $13 per week and lost time from the date of the accident till nearly the first of the following December, a period of about thirty-two weeks. He is entitled to recover for such time the sum of $416 and in view of the suffering he has undergone and some that he will probably have to endure occasionally for a time, I allow him an additional sum of $300.

Decree against the steamship and an order of reference to ascertain the other damages. Libels and petitions dismissed as to the tug.